## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **BELLATORUM LAND & MINERALS, LP** | § | **CASE NO. 21-32137** |
| | § | |
| **BELLATORUM PHALANX** | § | **CASE NO. 21-32138** |
| **INVESTMENTS, LP** | § | |
| | § | **CHAPTER 7** |
| | § | |
| **DEBTOR** | § | **JUDGE JEFFREY P. NORMAN** |

### TRUSTEE'S MOTION TO COMPROMISE ALL CLAIMS WITH PRODUCTION LENDING, LLC PURSUANT TO FRBP 9019

---

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN TWENTY-ONE (21) DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**A HEARING ON THE RELIEF REQUESTED HEREIN HAS BEEN SELF-CALENDARED FOR MARCH 9, 2022, AT 1:30 P.M. BEFORE THE HONORABLE JEFFREY P. NORMAN, 515 RUSK, 4TH FLOOR, COURTROOM 403, HOUSTON, TEXAS 77002.**

---

*To reduce copying and postage costs, copies of the exhibits referenced herein may not be included with the document you have received by mail. Further, the mailed version of this document may have multiple reduced size pages printed on each page.  If you want copies of the referenced exhibits and/or a full-sized copy of this document, please email mmyers@rossbanks.com, or call (713) 626-1200 and ask for the undersigned attorney, and an electronic copy will be promptly provided to you.*

**To the Honorable Jeffrey P. Norman,**
**United States Bankruptcy Judge**:

COMES NOW Eva S. Engelhart, Chapter 7 Trustee (the "Trustee") of the above-referenced

bankruptcy case, who brings the above-titled motion (the "Motion"), and would show as follows:

### A. Jurisdiction, Venue and Constitutional Authority

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (E), (M) and/or (O) and arises in and/or under Title 11.  The statutory predicate for the relief sought herein is 11 U.S.C. §§ 105, 506 and/or Federal Rule of Bankruptcy Procedure 9019.

2.      Venue is proper under 28 U.S.C. §§ 1408 and/or 1409.

3.      This Court has constitutional authority to enter a final order regarding this matter.  This motion concerns essential bankruptcy matters which have no equivalent in state law thereby rendering the limitations upon this Court's authority to enter final orders as set forth in the Supreme Court's opinion in *Stern v. Marshall* inapplicable.  *See In re Carlew*, 469 B.R. 666, 672 (Bankr. S.D. Tex. 2012) (discussing *Stern v. Marshall*, 131 S.Ct. 2594 (2011)).  In the alternative, all the matters addressed in this motion are essential bankruptcy matters which trigger the public rights exception.  *See Id.*

4.      This Motion seeks Court approval of a settlement of all claims by and between the Trustee, as Trustee of both of the above-captioned bankruptcy cases, and Production Lending, LLC, the pre-petition secured lender to the Debtors.  The settlement and compromise has been memorialized in the act of *Settlement Agreement and Release* which, including all exhibits thereto, is attached to this Motion as **Exhibit 3** (the "Settlement Agreement").

## B. Background

5.      On June 24, 2021, both Bellatorum Land & Minerals, LP ("BLM") and Bellatorum Phalanx Investments, LP ("BPI") filed for voluntary Chapter 7 relief.  BLM and BPI were ostensibly formed to own/hold royalty/mineral interests in oil and gas producing properties purchased with millions in investor funds.  Both BLM and BPI, its former general partner, Bellatorum Management GP, and other affiliated companies, were managed by Mr. Christopher Bentley until his admission that he utilized the Debtors and their affiliates to implement a wide ranging fraud of investors and in the use of corporate funds, and as well as, alleged by it, against Production Lending.  See **Exhibits 1** and **2**, which are Mr. Bentley's confession to investors and a public admission of his actions in an article of the Houston Business Journal.  These bankruptcy cases were filed after a group of investors from each Debtor were able to appoint a new general partner for the Debtors.

*The Loan Facility with Production Lending*

6.      The Trustee's investigation of the Debtors' business affairs is ongoing and the instant motion to compromise deals with only one aspect thereof:  its business dealings with Production Lending, LLC ("Production Lending"), the sole lender and secured creditor of both Debtors.  It has been alleged that the Debtors' investors were unaware of the Debtors' lending relationship with Production Lending, at least at the commencement of the Loan Facility; however, notwithstanding the same, on or about December 19, 2019, the Debtors, Bellatorum Management, GP and Production Lending entered into a Loan Agreement, Term Note in the original principal amount of $7.5 million, a Security Agreement and a separate Deed of Trust, Mortgage, Security Agreement, Assignment of Production and Financing Statement with Production Lending, true and correct copies of which are attached as Exhibits 1, 2, 3 and 6 to the Production Lending Affidavit attached as Exhibit D to the Settlement Agreement (collectively, along with other documents establishing recordation of security interests, UCC-1 Financing statements, Title Indemnity Agreements and agreements executed by and among the debtors and Production Lending, referred to as the "Loan Facility").  The debt created under the Loan Facility was secured by substantially all of both Debtors' interests in oil and gas producing properties, and the proceeds attributable to those interests, together with a blanket UCC-1 perfection of the liens and security interests created by the security agreement that is part of the Loan Facility, including those interests in properties located in Atascosa, Dimmit, Frio, Glasscock, Hemphill, Howard, Jack, Johnson, Karnes, LaSalle, Lavaca, Loving, Martin, Moore, Nacogdoches, Panola, Reeves, San Augustine, Shelby, Upton, Ward, Wilson, Winkler, and Zavala Counties, Texas.

7.      Through documentation provided to, and obtained by, the Trustee it has been shown to the Trustee that Production Lending advanced the total sum of $6,600,000.00 under the Loan Facility.  Through due diligence and information provided by Production Lending, the Trustee identified the transfer of funds by Production Lending to the Serrano Law Group[1], which, although not addressed in the Loan Facility, received the loaned funds ostensibly on behalf of Debtors.  See Exhibits 9, 11, and 15 to the Production

---

[1] The Serrano Law Firm is the Serrano Law Group and maintains a website at:  https://serranopllc.com.  The Serrano Law Firm advertises itself as primarily an immigration law firm.

Lending Affidavit.  Bank statements provided by Production Lending, and those obtained by subpoena from the Serrano Law Group, indicate the following transfers were made by Production Lending to the Serrano Law Group.  See Exhibits 11 and 14 to the Production Lending Affidavit:

| Date | Amount | Expenses Charged | Net Funds Received |
|------|--------|------------------|--------------------|
| 12/20/2019 | $1,600,000.00 | ($7,500.00) | $1,592,500.00 |
| 01/17/2020 | $1,400,000.00 | ($15,000.00) | $1,385,000.00 |
| 01/31/2020 | $2,700,000.00 | ($5,000.00) | $2,695,000.00 |
| 02/07/2020 | $900,000.00 | ($5,000.00) | $895,000.00 |
| | $6,600,000.00 | ($32,500.00) | $6,567,500.00 |

8.     The bank records subpoenaed from the Serrano Law Group indicate that after receipt of the foregoing funds, they were disbursed only in small part directly to the Debtors with the majority being transferred to third parties.  Receipts from third parties are also reflected in these records.  While some receipts potentially relate to mineral interest transactions, it is currently unclear to the Trustee what all the transactions reflected in these records relate to and the Trustee reserves all rights as against these third parties (which do not include the Production Lending Releasees as defined in the Settlement Agreement). The Trustee has, to date, seen no evidence that Production Lending had actual knowledge of the misuse of its loan proceeds prior to February 14, 2021, though as set forth in the Production Lending Affidavit, Production Lending did have suspicions it could not quantify as of November 2020.

***Payments to Production Lending, Entry into Multiple Forbearance Agreements and Retention of Red Oaks Energy Advisors to Market the Debtors Assets***

9.     The Loan Facility provided that the loan to the Debtors matured and was payable on June 30, 2020; however, it is alleged the Debtors were unable to meet their obligations thereunder by way of payment, refinance or other means.  On June 30, 2020, Production Lending and the Debtors entered into a Forbearance Agreement which provided, among other things, for an extension of the maturity date to September 30, 2020, See Exhibit 13 to the Production Lending Affidavit.

10.     After entry into the June 30, 2020 Forbearance Agreement, the following payments under

the Loan Facility were received by Production Lending[2]:

| Date | Amount | Payee | Source of Funds |
|------|--------|-------|-----------------|
| 10/01/2020 | $1,091,200.00 | Energy Net Services, LLC | Sale of certain oil and gas interests in Upton County, Texas, see Exhibit(s) 8 to the Production Lending Affidavit. |
| 10/01/2020 | $307,000.00 | The Serrano Law Group | Sale of certain oil and gas interests in Upton County, Texas, see Exhibit(s) 8 to the Production Lending Affidavit. |
| 10/15/2020 | $436,450.00 | Energy Net Services, LLC | Sale of certain oil and gas interests in Karnes County, Texas, see Exhibit(s) 8 to the Production Lending Affidavit. |

11.     On October 16, 2020, Production Lending and the Debtors entered into a second

Forbearance Agreement which provided, among other things, as follows, see Exhibit(s) 19 to the Production

Lending Affidavit:

> **4.  Payment Schedule.  Borrower hereby agrees to make the following loans payment as a condition of this Agreement, as described below:**
>
> a.   $763,550 by October 31, 2020
>
> b.   $1,200,000 by November 30, 2020
>
> c.   $1,200,000 by December 31, 2020
>
> d.   $1,200,000 by January 31, 2021
>
> e.   $1,200,000 by February 28, 2021
>
> f.   Any remaining outstanding balance, interest and fees by March 31, 2021
>
> g.   Loan payments can either be made through cash payments from the Borrower or assets sales of the Mortgaged Properties, provided that the Mortgaged Properties are sold at or above Borrower's cost basis.   To the extent that any Mortgaged Properties are sold below Borrower's cost basis, Borrower must receive Lender's consent prior to the sale.

---

[2] The Trustee reserves all rights against third parties, with the exception of Buteo Minerals, LLC, with regard to all transfers referred to in this motion.

12.     The Trustee has learned from Mr. Jonas Harrell, the former VP of Geoscience of the Debtor, that throughout 2020, the Debtor attempted to sell mineral interests ostensibly to generate funds with which to operate and to prevent foreclosure by Production Lending.  The Trustee is further advised by Mr. Harrell that the Upton and Karnes County sales referenced above, only went to public auction after private sale attempts failed.  Mr. Harrell further advised the Trustee that the Debtors' marketing attempts widely exposed the Debtors' assets to the mineral buying market.  During the latter portion of 2020, an introduction by the Debtors to Red Oaks Energy Advisors, an investment banking group ("Red Oaks"), was recommended and agreed to by Production Lending for the purpose of marketing the Debtors' mineral interests for sale.  On or about November 2, 2020, Bellatorum Resources, an affiliated entity, engaged Red Oaks to market certain assets, including all assets of BLM and BPI which were collateral of Production Lending under the Loan Facility (the "Collateralized Assets"), and shortly thereafter Red Oaks produced an initial presentation setting out, among other things, its initial suggestion of certain valuation metrics and as well a description of the proposed marketing process for the assets.  See Exhibit(s) 21 to the Production Lending Affidavit.  Red Oaks' compensation, aside from an expense fee of $10,000, was dependent on whether they achieved a sale, creating financial incentive for them to be successful in their efforts to sell the Collateralized Assets.  Production Lending has represented and averred to the Trustee, that it was aware of the marketing of the Collateralized Assets by Red Oaks and supported a sale of the Collateralized Assets in lieu of foreclosure.  See the Production Lending Affidavit.

13.     On December 9, 2020, Production Lending received a payment under the Loan Facility of $200,000.00, that Production Lending has not traced to a sale of collateral, though the Production Lending lien attached to all the Debtors' cash proceeds from the sale of mineral production as well as the mineral interests themselves.  See, Exhibit(s) 8 to the Production Lending Affidavit.

14.     On January 5, 2021, Production Lending and the Debtors entered into a Third Forbearance Agreement which provided, among other things, as follows (see Exhibit(s) 20 to the Production Lending Affidavit):

4. **Payment Schedule**. Borrower hereby agrees to make the following loans payment as a condition of this Agreement, as described below:

   a. $500,000 by January 31, 2021

   b. $500,000 by February 28, 2021

   c. Any remaining outstanding balance, interest and fees by March 31, 2021

   d. Loan payments can either be made through cash payments from the Borrower or assets sales of the Mortgaged Properties, provided that the Mortgaged Properties are sold at or above Borrower's cost basis. To the extent that any Mortgaged Properties are sold below Borrower's cost basis, Borrower must receive Lender's consent prior to the sale.

15.     After entry into the Third Forbearance Agreement, the following payments under the Loan Facility were received by Production Lending (see Exhibit(s) 8 to the Production Lending Affidavit):

| Date | Amount | Payee | Source of Funds |
|---|---|---|---|
| 02/22/2021 | $150,000.00 | Debtors[3] | |
| 02/02/2021 | $360,750.00 | Freehold | Sale of mineral interest in Upton County |
| 03/16/2021 | $62,500.00 | Hatch Royalty, LLC | Sale of mineral interest in Loving County, Texas, |
| 03/24/2021 | $40,644.72 | Debtors[4] | |
| 03/24/2021 | $250,750.00 | Crockett Mineral Co., LLC | Two separate sales of mineral interests in Karnes County, Texas |

16.     Production Lending has represented and averred, and provided documentation to the Trustee that from early January 2021 and through early to mid-March 2021, Red Oaks marketed the Collateralized Assets to third parties, but that those efforts did not result in a sale of the totality of the Collateralized Assets of a value and amount sufficient for Production Lending to release its liens to allow for such sale(s). See Exhibit(s) 21 and 22 to the Production Lending Affidavit. The results of Red Oaks marketing efforts are set forth in see Exhibit(s) 22 to the Production Lending Affidavit. As of February 4, 2021, the highest dollar amount offer received for the totality of the Collateralized Assets, after

---

[3]     Production Lending has not traced this payment to a sale of collateral, though the Production Lending lien attached to all the Debtors' cash proceeds from the sale of mineral production as well as the mineral interests themselves.

[4]     See Ft. Nt. 3; the statement applies to this payment as well.

approximately fifty (50) parties executed confidentiality agreement to review information on the assets offered for sale, was $2,000,000.00, see Exhibit(s) 22 to the Production Lending Affidavit. Production Lending has represented and averred to the Trustee that this aggregate offer was insufficient for Production Lending to release its lien rights, and that it did not consent to the sale its collateral package for this amount. Production Lending did agree to the sales of particular mineral interests that may have arisen out of the marketing process (See Exhibit 8 to the Production Lending Affidavit, regarding the March 2021 sales to Hatch (mineral interests in Loving County) and Crockett (mineral interests in Karnes County).

17.     After Red Oaks' marketing efforts failed, the parties agreed to a sale of the Collateralized Assets to an entity owned and/or controlled by Production Lending, Buteo Minerals, LLC ("Buteo"). See the Production Lending Affidavit. Buteo is a Texas Limited Liability Company registered on March 2, 2021, and is owned and/or operated by Production Lending and its affiliates, for the purpose of obtaining the property owned by Debtors. See the Production Lending Affidavit. On March 15, 2021, the parties executed an Assumption and Option Agreement transferring all the remaining oil and gas assets owned by BLM and BPI, excluding those interest in Gregg and Johnson counties of Texas, to Buteo (the "Assumption Agreement"), see Exhibit **23** to the Production Lending Affidavit. The primary benefit received by the Debtors under this agreement was a $3 million dollar credit to the debt owed to Production Lending, when the highest aggregate value for the Assets was $2 Million. See the Production Lending Affidavit.

***Production Lending's Lack of Knowledge of Chris Bentley's Fraudulent Activity, Until February 2021***

18.     Production Lending has represented and averred to the Trustee and has provided supporting documentation, that, by November 2020, it had become concerned regarding inconsistencies in transactions with the Debtors, such as erroneous property descriptions and asset purchase prices of certain oil and gas interests provided by the Debtors, which had become sufficiently material to confront Mr. Bentley over. See the Production Lending Affidavit. Production Lending has represented and averred to the Trustee that, on November 13, 2020, it sent an email to Mr. Bentley inquiring about such concerns and that Mr. Bentley responded through email the next day acknowledging these inconsistencies but did not admit to willful misconduct or misrepresentation, and has provided this communication to the Trustee. See Exhibit(s) 25

to the Production Lending Affidavit.

19.    Production Lending has represented and averred to the Trustee that on February 14, 2021, it received two emails from Mr. Bentley confirming their suspicions concerning Bentley's bad acts regarding Production Lending loan proceeds, and has provided this documentation to the Trustee.  See Exhibit(s) 26 to the Production Lending Affidavit.  Production Lending has represented and averred to the Trustee that prior to February 14, 2021, it had no knowledge that Mr. Bentley, any agent or purported agent of Borrowers, or any other person purporting to act for the Debtors had made any misrepresentations to investors in the Debtors of any kind, including, but not limited to misrepresentations concerning the use of loan proceeds for improper/unauthorized purposes, the sale or use of collateral, the extent and/or value of collateral, the generation of income from collateral or knowing misrepresentations of material facts to Production Lending and third parties.  See the Production Lending Affidavit.

***Funds Received by the Trustee Post-Petition***

20.    Shortly after the Petition Date, the Trustee received a total of $234,056.35 from funds on deposit, being $33,342.74 by the BLM estate and $200,713.61 by the BPI estate.  The Trustee has also received and deposited an additional approximately $6,973.84, total, for both estates for what appear to be royalty payments on oil and gas interests either were owned by, or which are still in the name of, the Debtors.  Additionally, the Trustee is holding, and continues to receive, but has not deposited, some checks for what also appear to be royalty payments.  As of February 2, 2022, the Trustee has received checks totaling Twelve Thousand Twenty-Five and 58/100ths Dollars ($12,025.58) that she is holding, uncashed. Production Lending has claimed that all of these funds, including un-negotiated checks, are income generated by the Collateralized Assets and constitute its cash collateral.

*Source of Funds for the $33,342.75 on deposit Received by the BLM Estate*

21.    The $33,342.75 received by the Trustee came from a Wells Fargo account ending in the last 4-digits 7097 (the "Wells Fargo 7097 Account") in the name of BLM.  Attached as **Exhibit 4.a** is the July 2021 statement for this account which shows the following balance and remittance to the Trustee:

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|------|------|------|------|------|
| 7/8 | | Interest Payment | 0.07 | | |
| 7/8 | | Bankruptcy Trustee Request Ep-21070800335 | | 33,342.75 | 0.00 |
| **Ending balance on 7/31** | | | | | **0.00** |

22.     The Wells Fargo 7097 Account was opened in May 2021 with an opening deposit on May

27, 2021 was $36,870.35.  Thereafter, the following debits and credits occurred prior to the turnover of

funds to the Trustee, see **Exhibits 4.b** and **4.c**[5]:

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|------|------|------|------|------|
| 5/27 | | Checking Opening Deposit | 36,870.35 | | 36,870.35 |
| 5/28 | | Interest Payment | 0.04 | | 36,870.39 |
| 6/3 | 9999 | Check | | 6,722.74 | |
| 6/3 | | Check | | 586.14 | 29,561.51 |
| 6/4 | 17139221 | Check | | 2,485.88 | 27,075.63 |
| 6/11 | | Deposit | 10,768.50 | | 37,844.13 |
| 6/15 | | Harland Clarke Check/Acc. 061421 ( Land ?038? | | 37.79 | 37,806.34 |
| 6/21 | | Withdrawal Made In A Branch/Store | | 400.00 | |
| 6/21 | | Withdrawal Made In A Branch/Store | | 77.81 | 37,328.53 |
| 6/22 | 1002 | Cashed Check | | 1,969.50 | |
| 6/22 | | Withdrawal Made In A Branch/Store | | 4.70 | 35,354.33 |
| 6/24 | | Porter Hedges Ll Payment 210623 0 Land and Ml | | 2,011.91 | 33,342.42 |
| 6/30 | | Interest Payment | 0.26 | | 33,342.68 |

23.     The May 27, 2021 $36,870.35 opening deposit into the Wells Fargo 7097 Account was a

transfer of funds from an account in the name of the Debtor with BBVA ending in the last 4-digits 2524

(the "BBVA 2524 Account") set out below, also see **Exhibits 4.e and 4.f** (emphasis added):

**Activity Summary**

| | |
|------|------|
| Beginning Balance on 5/1/21 | $949.91 |
| Deposits/Credits (4) | + $35,920.44 |
| Withdrawals/Debits (1) | - $36,870.35 |
| **Ending Balance on 5/26/21** | **$0.00** |

| Date * | Check/ Serial # | Description | Deposits/ Credits | Withdrawals/ Debits | End of Day Balance |
|------|------|------|------|------|------|
| 5/10 | | BRANCH DEPOSIT | $1,233.86 | | $2,183.77 |
| 5/14 | | BRANCH DEPOSIT | $30,323.88 | | $32,507.65 |
| 5/18 | | BRANCH DEPOSIT | $197.51 | | $32,705.16 |
| 5/26 | | ONLINE BANKING TRANSFER FROM ACCT *8783 | $4,165.19 | | |
| 5/26 | | CHECK CLEARED | | $36,870.35 | $0.00 |

---

[5] All but $500.00 of the $10,768.50 deposit on June 11, 2021 came from what appears to be income generated from the Collateralized Assets, see **Exhibit 4.d**.

24.    The deposits into the BBVA 2524 Account, including all but $10.00 of the $949.91 beginning balance on May 1, 2021, and appear to have come from income generated from the Collateralized Assets, see **Exhibits 4.g** through **4.k**; provided, however, the source of the deposit of $4,165.19 made on May 26, 2021, is not currently known to the Trustee.

*Source of Funds for the $200,713.61 Received by BPI Estate*

25.    The $200,713.61 received by the Trustee came from a Wells Fargo account ending in the last 4-digits 6714 (the "Wells Fargo 6714 Account") in the name of Bellatorum Phalanx Minerals 2018, LP, a non-debtor entity.  It is the Trustee's understanding that this account was under the control of the group of limited partners that facilitated the filing of the instant bankruptcy cases, see **Exhibit 5.a**.  The Wells Fargo 6714 Account had an opening deposit of $241,961.66 on May 27, 2021, with the following debits and credits occurring until the account was closed by way of the payment made to the Trustee mentioned above, see **Exhibits 5.a** and **5.b**:

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 5/27 | | Checking Opening Deposit | 241,961.40 | | 241,961.40 |
| 5/28 | | Interest Payment | 0.26 | | 241,961.66 |
| 6/3 | 9999 | Check | | 24,647.95 | |
| 6/3 | | Check | | 2,148.99 | 215,164.72 |
| 6/4 | | Check | | 9,114.12 | 206,050.60 |
| 6/11 | | Deposit | 10,890.55 | | 216,941.15 |
| 6/15 | | Harland Clarke Check/Acc. 061421 00 Phalanx | | 37.79 | 216,903.36 |
| 6/16 | | Purchase authorized on 06/16 Best B P00000000584568054 Card 5885 | | 238.13 | 216,665.23 |
| 6/21 | | Edeposit IN Branch/Store 06/21/21 0 Rd Tomball TX 5885 | 77.81 | | |
| 6/21 | | Purchase authorized on 06/18 Capit S461169605956589 Card 5885 | | 125.00 | |
| 6/21 | | Withdrawal Made In A Branch/Store | | 400.00 | 216,218.04 |
| 6/22 | | Edeposit IN Branch/Store 06/22/21 1 Rd Tomball TX 5885 | 4.70 | | |
| 6/22 | | Purchase authorized on 06/22 USPS Magnolia TX P00581173598376308 0 | | 9.40 | |
| 6/22 | 1001 | Cashed Check | | 7,220.90 | 208,992.44 |
| 6/24 | | Porter Hedges LI Payment 210623 0 Phalanx Min | | 7,376.38 | 201,616.06 |
| 6/28 | | Purchase authorized on 06/25 Googl CA S581176684483778 Card 5885 | | 904.51 | 200,711.55 |
| 6/30 | | Interest Payment | 1.73 | | 200,713.28 |

26.    The $241,961.40 opening deposit into the Wells Fargo 6714 Account was made from funds paid from an account that had been under the control of Mr. Bentley (the "BBVA 8546 Account").  See

below and also **Exhibits 5.c and 5.d**:

## Activity Summary

| | |
|---|---:|
| Beginning Balance on 5/1/21 | $278.69 |
| Deposits/Credits (3) | + $241,682.71 |
| Withdrawals/Debits (1) | - $241,961.40 |
| **Ending Balance on 5/26/21** | **$0.00** |

| Date * | Check/ Serial # | Description | Deposits/ Credits | Withdrawals/ Debits | End of Day Balance |
|---|---|---|---:|---:|---:|
| 5/10 | | BRANCH DEPOSIT | $7,218.87 | | $7,497.56 |
| 5/14 | | BRANCH DEPOSIT | $219,084.68 | | $226,582.24 |
| 5/26 | | ONLINE BANKING TRANSFER FROM ACCT *8783 | $15,379.16 | | |
| 5/26 | | CHECK CLEARED | | $241,961.40 | $0.00 |

27.     The May 10, 2021, deposit of $7,218.87 into the BBVA 8546 Account, set out above, appears to have come from income generated from the Collateralized Assets, see **Exhibit 5.e**.  The May 14, 2021, deposit of $219,084.68 into the BBVA 8546 Account, set out above, came from a combination of a cashier's check in the amount of $217,769.93 from JPMorgan Chase Bank, discussed below, with the balance coming from what appears to be income generated from the Collateralized Assets, see **Exhibit 5.f**. The Trustee is not currently aware of the source of the May 26, 2021, deposit of $15,379.16.  However, the Trustee is aware that the $217,769.93 cashier's check from JPMorgan Chase Bank came from funds on deposit in yet another account in the name of BPI with JPMorgan Chase Bank ending in the last 4-digits 8282 (the "Chase 8282 Account"), see below and **Exhibits 5.g** and **5.h**:

## OTHER WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---:|
| 05/14 | 05/14 Withdrawal | $217,769.93 |

28.     The funds in the Chase 8282 Account used to make the transfer to the BBVA 8546 Account came from deposits in the month of April 2021, as set forth below and in **Exhibit 5.i**:

## CHECKING SUMMARY — Chase Platinum Business Checking

| | INSTANCES | AMOUNT |
|---|---:|---:|
| **Beginning Balance** | | $0.00 |
| Deposits and Additions | 3 | 355,888.24 |
| Electronic Withdrawals | 2 | -138,118.31 |
| **Ending Balance** | **5** | **$217,769.93** |

| DEPOSITS AND ADDITIONS | | | |
|---|---|---|---|
| DATE | DESCRIPTION | | AMOUNT |
| 04/06 | Deposit | 1114518604 | $343,494.97 |
| 04/28 | Deposit | 1975820920 | 11,653.25 |
| 04/30 | Deposit | 1976035644 | 740.02 |
| **Total Deposits and Additions** | | | **$355,888.24** |

The deposit tickets for the foregoing deposits are attached **Exhibits 5.j** to **5.l** and appears to show the funds for those deposits coming from what appears to be income generated from the Collateralized Assets.

29.     Production lending has provided documentation of several hundred thousand dollars paid to the Debtors prior to the petition date that were not turned over to Production Lending, despite the requirements of the Loan Facility. For example, in March 2021 Trinity Operating paid $302,699.49 in royalty payments (covering a period of time longer than the normal monthly royalty payment schedule), but the Debtors failed to turn these funds over the Production Lending.  In fact, it appears as though the checks paid out prior to filing were and constituted Cash Collateral, and were used by the debtors in default of the Loan Facility.  The Trustee considers it likely that at the funds referred to in this paragraph are reflected in the flow of funds described above.

30.     The $33,342.75, $200,713.61, $6,973.84 in checks received and deposited, the $12,025.58 in checks received but not deposited, and any further income general from the Collateralized Assets by the Trustee after the Petition Date are hereby generally referred to as the "Cash Collateral."

## C. Relief Requested

31.     The Trustee, as Trustee of both Debtors and Production Lending have reached the Settlement Agreement, subject to Court approval.  Subject to the terms of the Settlement Agreement (the Settlement Agreement controls over any conflicting description within this Motion), the settlement provides, generally:

- For the Estate to charge the sum of $100,000.00 out of the Cash Collateral, as a surcharge/settlement payment (the "Estate Settlement Amount");

- The Trustee/Debtors (a) release Production Lending, Buteo, and all affiliates, successors, assigns, etc., from all claims and causes of action possibly assertable by the Trustee,

Debtors and the Estates, including but not limited to any claim existing or arising under Sections 541 through 553 of the Bankruptcy Code;

- The Trustee shall turnover to Production Lending all remaining the Cash Collateral net of the Estate Settlement Amount, and all proceeds that comprise the collateral subject to the liens of Production Lending as may be otherwise held or collected by the Trustee (including funds yet uncashed and that may be received in the future)

- Production Lending shall have an allowed general unsecured claim against each bankruptcy estate in the amount of $2,000,000.00, minus the amount of Cash Collateral received at closing of the settlement and which may thereafter be received.

- Production Lending shall release the Trustee, Debtors and the Estates from any claims or causes of action, except for the maintenance of its lien rights and its Allowed Claim (as defined in the Settlement Agreement.

- Production Lending shall assist the Trustee as it is reasonably and commercially able, with respect to the Trustee's investigation of the claims of the Estates against other third parties, including management of the Debtors.

32.     The full terms and conditions of the proposed settlement are set forth in the Settlement Agreement.  The Trustee believes the proposed settlement to be in the best interests of the Estate and its creditors.

33.     This Court is empowered to approve a compromise settlement of a debtor's and creditor's claims under Rule 19 (FRBP 9019).  *Matter of Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349, 355 (5th Cir. 1997) (*citing Matter of Foster Mortg. Co.,* 68 F.3d 914 (5th Cir. 1995)).  Compromises are favored in bankruptcy, and the decision to approve or disapprove the compromise of the parties rests in the sound discretion of the bankruptcy judge.  *In re Raborn*, 2017 WL 4536090, at *2 (Bankr. M.D. La.) (*citing Marandas v Bishop (In re Sassalos),* 160 B.R. 646, 653 (D. Oregon 1993).

34.     Rule 9019(a) authorizes Courts to approve compromises that are fair and equitable and in the best interest of the estate. *Official Committee of Unsecured Creditors v. Cajun Elec. Power Co-Op, Inc., (Matter of Cajun Elec. Power Co-op., Inc.)*, 119 F.3d 349, 355 (5th Cir. 1997). As mentioned, the merits of a proposed compromise should be judged under the criteria set forth in *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968). *Anderson* requires that a compromise, in consideration of the factors set out, must be "fair and equitable." Anderson, 390 U.S. at 424; *In re AWECO, In*c., 725 F.2d 293, 298 (5th Cir.), *cert. denied*, 469 U.S. 880 (1984). The terms "fair and equitable" mean that (a) senior interests are entitled to full priority over junior interests; and (b) the settlement is reasonable in relation to the likely rewards of litigation. *Cajun Elec*.., 119 at 35; In re Jackson Brewing Co., 624 F.2d 599, 602 (5th Cir. 1980). In particular, the Court must evaluate and set forth in a comprehensible fashion:

(i) The probability of success in the litigation, with due consideration for the uncertainty in fact and law,

(ii) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and

(iii) All other factors bearing on the wisdom of the compromise.

*Jackson Brewing Co*., 624 F.2d at 602 (internal citation omitted).

35.     With respect to the first factor, it is unnecessary to conduct a mini-trial to determine the probable outcome of any claims waived in the settlement. *Cajun Elec*., 119 F.3d at 356. "'The judge need only apprise himself of the relevant facts and law so that he can make an informed and intelligent decision . . . .'" *Id*. (quoting *La Salle Nat'l Bank v. Holland (In re American Reserve Corp*.), 841 F.2d 159, 163 (7th Cir. 1987)).

36.     The Second factor is discussed below.

37.     As to the third factor, the Fifth Circuit has articulated two additional specific factors from the general "bearing on the wisdom of the compromise" factor:  (i) whether the compromise serves "the paramount interest of creditors with proper deference to their reasonable views." *In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008); *Cajun Elec.*, 119 F.3d at 356. When applying this factor, courts generally

consider the consideration offered by the settling party and the degree to which creditors object.  *Id*; and "[T]he extent to which the settlement is truly the product of arms-length bargaining and not of fraud or collusion." *Id*.

38.     The factors all establish without question the validity of the Trustee's settlement.

a.     **Probability of Success in Litigation** / **The Complexity, Expense, and Likely Duration of Such Litigation**:  The Trustee has not obtained any information that would justify initiation of litigation against Production Lending in connection with either (i) Mr. Bentley's admitted fraudulent activities or (ii) the nature, extent or validity of the underlying debt and securitization thereof on reasonable grounds; however, the Settlement Agreement and Release specifically includes a revocation/rescission period should it prove that material misrepresentations were made to the Trustee.  Further, the Trustee reserves all rights against third parties with regard to any aspect of the Debtors' pre-petition activities, as such may generate claims against other parties, persons or entities.  Production Lending likewise reserves any purely direct claims it may have against third parties.  With regard to litigation claims that theoretically could arise from the transfer occasioned by the Assumption and Option Agreement with Buteo, it is very unclear to the Trustee that the Trustee could be successful in any litigation based on at least the following:

(i) The Trustee's investigation into the Debtors' prepetition financial activities has been impacted by the limited availability of business records and reliability of those actually received.  Prior to the Petition Date, the FBI seized, and retains, whatever computers and physical records remained of the Debtor.  Although the limited partners who facilitated the filing of this bankruptcy case came into possession of some records, including the download of data from a Google drive formerly utilized by the Debtors, they were not complete and reliability thereof is suspect due to Mr. Bentley's former control and influence over such information before they were able to obtain it.  The FBI did release two seized hard drives to Mr. Bentley, who then physically turned them over to the Trustee; however, the information contained therein is largely what the limited partners had obtained, with the exception of transactional documents related asset purchases and sales. In terms of the proposed settlement, the Trustee is relying primarily on the information received to date per the above; the material aid from Mr. Jonas Harrell, the former VP of Geoscience of the Debtor with personal knowledge of the events involved and whose primary job was to value oil and gas acquisitions; subpoenaed bank records of the Debtor; subpoenaed records from the Serrano Law Group, information produced by Production Lending and the negotiated terms of the Production Lending Affidavit.  Further, Production Lending made multiple productions of documents and information, and both its counsel and the company representatives answered questions from the Trustee's counsel, all without the necessity of formal discovery requests.  Acquiring additional more detailed information, and the expert advice needed to acquire and interpret that information, will require funds that are simply not available to the Trustee given the lack of likely unencumbered funds.  Further, the likelihood of litigation financing, ignoring the typical unfavorable terms thereof, is very unlikely due to the uncertain nature, extent and viability of specific litigation claims against solvent third parties.

(ii) The COVID-19 Pandemic had, and continued to have, an adverse effect on the oil and gas industry generally and specifically as to the Debtors' assets as evidenced by the general inability to sell those assets at desirable prices during the majority of 2020 and into the first quarter of 2021.  This conclusion is further buttressed by Mr. Harrell's information that the

Debtors most valuable assets, which were in Upton and Karnes County, Texas, could not be sold by privately despite efforts to do so and instead had to be sold via Energy Net, a public auction site which, although commonly used in the oil and gas industry as a clearinghouse, normally does not produce as good of results as private sales. While Red Oaks was able to solicit an offer of $2,000,000 for the Debtors remaining assets, Mr. Harrell has advised that this amount was significantly less than what might have been generated but for a depressed oil and gas market and saturation from months of prior direct asset marketing. Even if this offer had been accepted, the proceeds would have been entirely consumed by Production Lending's lien. In fact, as Production Lending has stated, what occurred was that after it was decided that a sale of the entire asset package for $2,000,000 was not acceptable, the Debtors made three separate sales reflected above (in paragraph 15) of properties that were included in the $2,000,000 offer (the Freehold, Hatch Royalty, LLC and Crockett Mineral Co., LLC sales) for a total of $652,144.72. Deducting those sales from the $2,000,000 offer price left an offer price value of $1,347,855.28. The Buteo sale was for the remaining assets covered by the $2,000,000 offer (except the Excluded Assets as defined in the Settlement Agreement), so in effect, the $3,000,000 credit was for the remaining assets valued by the offer at $1,347,855.28. A portion of the Trustee's evidentiary burden in litigation, if such were to be instituted to avoid the transfer to Buteo, would be to establish that the value given for this transfer, the credit of $3 million to the underlying indebtedness, was less than reasonable equivalent value for the assets sold, and thus inadequate at the time of the transfer, not in comparison the value of the assets when originally purchased or at a later date after the transfer in the event of improved market conditions.

(iii) Finally, any avoidance litigation involving Production Lending/Buteo would require, among other things, significant additional discovery and expert testimony on numerous topics including as noted above, but not limited to, the value of the underlying assets at the time of their transfer, and the Trustee has used her business judgment and advice of counsel to determine that such pursuit and engagement of experts would yield no benefit to the estate. Production Lending did not refuse to produce any information requested, and on several occasions voluntarily consulted with Trustee's counsel to answer questions and provide information. Also, the funding needs for such litigation are in addition to funding needs required for the investigation and pursuit of additional third party claims. The funds on hands with each bankruptcy estate appear to the Trustee to be reasonably traceable to income generated from the Collateralized Assets and, as such, without there being a reasonable basis to challenge Production Lending's secured status, would be Production Lending's cash collateral and not useable absent their consent.

   b. **Terms of Compromise Versus Likely Rewards of Litigation**: The proposed compromise allows the Debtors to recover a surcharge/cash amount of $100,000.00 from encumbered funds and, for a limited period of time, reserves the right to seek rescission in the event of material misrepresentation. The funds proposed to be received by Debtors can then be used to employ special litigation counsel to conduct a wider investigation into the Debtors' business affairs and bring litigation claims as appropriate. The potential rewards of litigation against Production Lending or Buteo are at best unclear given the lack of reasonably discernable damage model for litigation with Production Lending or Buteo.

   c. **Difficulties in Collection of a Judgment**: This factor is considered neutral as the assets transferred are mineral interests and third parties would be on notice should litigation ensue and the Trustee file notices of *lis pendens*. The Trustee does not know of any difficulties in collection from Buteo of Production lending, but this neutral factor does not outweigh the other factors that

weigh heavily in favor of the Settlement.  The Trustee has therefore determined that the benefits of the Settlement outweigh any possible litigation result.

39.    Absent approval of this Settlement, the estate will have no unencumbered funds with which to conduct its investigation of the underlying and admitted to acts of fraudulent conduct on the part of management of the Debtors, and to seek to recover value that may be recoverable from either management persons or their affiliates, successors, assigns and/or insiders, or other third parties.  Further, the Production Lending claim will be allowed in an amount less than could have been (by several hundreds of thousands of dollars if the fees chargeable under the Loan Facility had not been waived as part of the settlement). Finally, Production Lending has agreed to continue to cooperate as reasonably possible, to assist the Trustee in her further investigation (Production Lending has already provided information to federal authorities, as a victim of the Debtors' fraudulent activities).

40.    There is no prejudice to other creditors, as the settlement provides the Trustee with funding to pursue her investigation, which it is hoped will generate funds for distribution.

### The Settlement is in the best interest of creditors, parties who have filed proofs of claim, and is the produce of arms-length bargaining.

41.    The Fifth Circuit has instructed that the "desires of the creditors are not binding." *Cajun Elec.*, 119 F.3d at 358 (citing *In re Foster*, 68 F.3d at 917). "The test is not the desires of the majority [of creditors] as such, but the best interests of the creditors, taking into account their reasonable views." *Id*.

42. Here, examination of the claims registers in the two cases, establish that there are basically two classes of claims on file:  (i) priority tax claims and (ii) "claims" arising from investments made by limited partners of the Debtors.  .  Allowing the claim of Production Lending under Section 726 will not adversely affect creditors of the estate, as the claim will, except to the extent secured, be an unsecure claim in an amount far less than could be claimed; and will not adversely affect the rights of (i) priority claimants, or (ii) the holders of investment claims (given section 726 (a) which expressly invokes section 510 (which subordinates certain claims, including claims for damages resulting from the purchase of a security of the debtor ("a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of

the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502  on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock."

43.    The Trustee at all times was represented by counsel in settlement negotiations, as was Production Lending.  There is no basis upon which to suggest anything other than arms' length negotiation, and, in fact, the lengths that Trustee went to so that this Court could be assured that this settlement was made at arms' length (including requiring the Production Lending Affidavit, and obtaining the Exhibits to the Affidavit as well as the Produced Documents, the index of which is attached as Exhibit 3 to the Settlement Agreement, establish the good faith and arms' length nature of this settlement.

44.    The Settlement does not involve the problem faced by the Supreme Court in *Czyzewski et al. v. Jevic Holding Corp. et al*., 137 S. Ct. 973 (2017), nor does it run afoul of *U.S. v. Aweco, Inc*., 725 F.2d 292, 298 (5th Cir. 1984).  In *Jevic*, the Court held that bankruptcy courts may never approve structured dismissals that provide for distributions that run afoul of the Bankruptcy Code's priority rules without consent of the affected creditors.  Here, Production Lending is the senior secured creditor and the settlement involves it giving up part of its collateral to the estate.  The estate loses nothing, and there is no attempt to affect the statutory priority of rights.  Further, there are no conditions tied to the settlement other than as expressly contained therein.  In fact, the Trustee obtained the agreement of Production Lending that the estate retains the right of rescission under certain circumstances, for a reasonable period of time.  In other words, there is no restructuring of rights, no suspect releases, etc.  Trustee requests that this Court order that the settlement be approved, and further that the order approving the settlement.

WHEREFORE, the Trustee requests that this Court, after due proceedings, approve the Settlement Agreement attached hereto, and for such other and further relief to which entitlement may be shown.

Respectfully submitted,

*/s/ Marc Douglas Myers*

_____

Marc Douglas Myers
Ross, Banks, May, Cron & Cavin, P.C.
SBN 00797133
7700 San Felipe, Suite 550
Houston, Texas 77063
(713) 626-1200; (713) 623-6014 fax
mmyers@rossbanks.com
COUNSEL FOR THE TRUSTEE